**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| EASTGATE INVESTMENTS II, LLC, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:20-CV-286-TLS-JPK |
| | ) | |
| MW BUILDERS, INC., | ) | |
| Defendant. | ) | |
| _____ | ) | |
| MW BUILDERS, INC., | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FOX VALLEY CONTRACTORS LLC; | ) | |
| KORELLIS ROOFING, INC.; | ) | |
| R-WALLS LLC; and RICHMOND | ) | |
| GUTTERING COMPANY, | ) | |
| Third-Party Defendants. | ) | |

**OPINION AND ORDER**

Currently before the Court is the Renewed Motion To Compel Arbitration and Stay Proceedings [DE 94] filed by Third-Party Defendant Korellis Roofing, Inc. ("Korellis"). For the following reasons, Korellis's motion is DENIED.

**BACKGROUND[1]**

This lawsuit involves disputes arising from the construction of two student housing apartment buildings in Valparaiso, Indiana, commonly known as Buildings 3 and 4 of the Uptown East Apartments ("the Project"). Plaintiff Eastgate Investments II, LLC (Eastgate) is the Project Owner, and Defendant/Third-Party Plaintiff MW Builders, Inc. (MWB) was the General

_____

[1] The Court draws the facts in this section from the various pleadings and attachments thereto. The Court is not assuming the truth of the matters asserted but merely setting forth what is alleged.

Contractor on the Project. The Prime Contract between Eastgate and MWB,[2] entered into on December 9, 2009, is a form document published by the American Institute of Architects (AIA)[3]––A102-2007 Standard Form of Agreement Between Owner and Contractor ("Standard Agreement") [DE 1-1 at 1-26]. The Standard Agreement incorporates by reference another AIA form—A201-2007 General Conditions of the Contract for Construction ("General Conditions") [*id.* at 27-85].[4] AIA Documents A102 and A201 are standard AIA forms that have been in service since 1992, *SBP LLLP v. Hoffman Constr. Co. of Am.*, No. 1:19-cv-00266-DCN, 2019 WL 7040611, at *4 (D. Idaho Dec. 20, 2019), which "detail[ ] the parties' respective rights, responsibilities and relationships on the project," *In re D. Wilson Constr. Co.*, 196 S.W.3d at 777.[5]

The Project was substantially complete as of September 2010.[6] Approximately ten years later, on August 4, 2020, Eastgate filed this lawsuit against MWB alleging that MWB was negligent in, among other things, failing to hire competent subcontractors to construct the exterior

---

[2] [DE 1-1 (Ex. A to Complaint)].

[3] "The American Institute of Architects represents the professional interests of America's architects. Among other things, the AIA publishes industry standard documents for design and construction projects." *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 777 n.1 (Tex. 2006) (internal citations omitted).

[4] *See* [DE 1-1 at 3 (Article 1) ("The Contract Documents consist of this Agreement, Conditions of the Contract (General Conditions, AIA Document A201-2007), Drawings, [etc.] … all of which form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein.")].

[5] "The AIA has a variety of standard form contracts. The [A102 and A201] refer[ ] to a specific draft form, while '200[7]' refers to the year that form was created. There are often prior and later versions of a form[.]" *SBP LLLP*, 2019 WL 7040611, at *1 n.1; *see, e.g., MPACT Constr. Grp., LLC v. Superior Concrete Constructors, Inc.,* 785 N.E.2d 632, 635 n.2 &  n.4 (Ind. Ct. App. 2003) ("*MPACT I*") (involving AIA Document A101, 12th ed. (1987) and AIA Document A201, 14th ed. (1987)), *aff'd*, 802 N.E.2d 901 (Ind. 2004) ("*MPACT II*").

[6] This is according to Eastgate's Complaint. *See* [DE 1 ¶ 8]. The exact date of completion, however, may be disputed. *See* [DE 7 at 3-4 (Answer to ¶ 8 of Complaint)].

walls and roofing assemblies of the Buildings. MWB then brought the Third-Party Complaint against the allegedly negligent subcontractors alleging breach of contract and indemnity claims. [DE 11]. Relevant to the present motion are MWB's third-party claims against Korellis, who was the roofing subcontractor for Building 3.

Eastgate alleges in its Complaint against MWB that the construction of Building 3's roof assembly (consisting of the membrane, oriented strand board sheathing, insulation, integral vapor retarder, wood stud framing, furring strips, and painted interior gypsum board) was improper and in violation of applicable building codes and accepted industry standards. Specifically, Eastgate alleges extensive deterioration of the roof from moist air penetrating from the interior of the building as the result of a failure to properly install insulation and vapor retarder and seal penetrations within and through the roof assembly. [DE 1 ¶¶ 19-22]. In turn, MWB's Third-Party Complaint alleges that, to the extent Eastgate's allegations regarding defects in the roof assembly of Building 3 are proven to be true, Korellis breached its contractual obligations contained in the subcontractor agreement between MWB and Korellis ("the Subcontract"),[7] and was negligent in performing the roofing work. [DE 11 ¶¶ 30-31, 34, 37]. MWB also alleges that, pursuant to the Subcontract, Korellis is required to indemnify, defend, and hold MWB harmless for all claims and causes of action incurred by MWB as a result of any fault by Korellis in connection with the performance of the Subcontract. [*Id.* ¶ 33].

By its present motion, Korellis seeks to stay all proceedings against it relating to MWB's Third-Party Complaint, and compel arbitration with MWB. Korellis's motion to compel arbitration is based on Section 14.1 of the Subcontract, which states in part that "Subcontractor [Korellis]

---

[7] The Subcontract does not appear to be an AIA standard form contract but instead is a document titled "Standard Form of Subcontract" dated January 14, 2010. *See* [DE 11-2 (Exhibit 2 to Third-Party Complaint)].

agrees that the dispute resolution provisions of the Prime Contract between MW[B] and Owner [Eastgate], if any, are incorporated by reference as part of this Subcontract so as to be binding as to disputes between Subcontractor [Korellis] and MW[B] that involve, in whole or in part, questions of fact and/or law that are common to any dispute between MW[B] and Owner or others similarly bound to such dispute resolution procedures …." [DE 11-2 at 7]. Section 13.2 of the Prime Contract, Standard Agreement, in turn, states that, "[f]or any Claim subject to, but not resolved by mediation pursuant to Section 15.3 of [the General Conditions], the method of binding dispute resolution shall be as follows: … [**X**] Arbitration pursuant to Section 15.4 of [the General Conditions]." [DE 1-1 at 11)]. Korellis interprets these contractual provisions as broadly mandating arbitration for all disputes between it and MWB that arise out of or are related to the Prime Contract. [DE 95 at 6]. Korellis filed a previous motion to compel arbitration in November 2021. That motion was denied without prejudice with the consent of all parties, in order to allow Eastgate, MWB, Korellis, and the other subcontractor Third-Party Defendants to participate in informal discovery followed by mediation. Mediation was held on May 23, 2022, but did not result in a settlement of the lawsuit. Korellis then filed the Renewed Motion to Compel Arbitration And Stay Proceedings currently before the Court.

## DISCUSSION

The Federal Arbitration Act ("FAA") declares in relevant part that a written agreement to arbitrate "in any maritime transaction or a contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract …." 9 U.S.C. § 2. The case law broadly defines transactions involving commerce to which the FAA applies to include "trade generally between citizens of the several states." *MPACT I,* 785 N.E.2d at 636 n.6 (internal quotation marks and citation omitted).

4

MWB is a Texas corporation while Korellis is an Indiana corporation. [DE 11, 36, at ¶¶ 1, 3]. Therefore the Subcontract is an agreement evidencing a transaction involving interstate commerce. *See MPACT II*, 802 N.E.2d at 904 (citing, *inter alia*, *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 400-01 (1967)); *see also SBP LLLP*, 2019 WL 7040611, at *3 (citing *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 274-75 (1995) (the interstate-commerce requirement should be construed broadly to include all activities that merely affect interstate commerce)).

"Under the FAA, three things are needed to compel arbitration: (1) a written arbitration agreement, (2) a dispute within the scope of the agreement, and (3) a refusal to arbitrate that dispute." *Bonzani v. Goshen Health Sys., Inc.*, 459 F. Supp. 3d 1139, 1147 (N.D. Ind. 2020) (citing *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005)). "'[I]f a dispute presents multiple claims, some arbitrable and some not, the former must be sent to arbitration even if this will lead to piecemeal litigation.' A court may not refuse to compel arbitration on claims merely because some of the claims are not arbitrable." *Id.* (quoting *KPMG LLP v. Cocchi*, 565 U.S. 18, 19 (2011)).

The parties to the present motion, i.e., Korellis and MWB, agree that Korellis has satisfied the first and third requirements for a motion to compel arbitration in that it has shown that the Subcontract includes an enforceable agreement to arbitrate and that MWB refuses to arbitrate. It also is uncontested that, *if* the arbitration provision in the Prime Contract is included within the dispute resolution incorporation clause of the Subcontract and covers the present dispute, Korellis would be entitled to a stay of these proceedings.[8] Finally, the Court notes that there is no waiver

---

[8] *See Auto-Owners Ins. Co. v. Pletcher*, No. 3:18-CV-949 JD, 2019 WL 1930231, at *1 (N.D. Ind. May 1, 2019) ("When a court compels arbitration, it must also stay the claims." (citing 9 U.S.C. § 3)).

issue here. *See Auto. Mechs. Loc. 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 747 (7th Cir. 2007) ("Like many other contractual rights, '[a] contractual right to arbitrate may be waived, either expressly or implicitly.'" (quoting *Grumhaus v. Comerica Sec., Inc.*, 223 F.3d 648, 650 (7th Cir. 2000))).[9] That is, even though Korellis has been participating in these proceedings for more than a year, it has validly reserved its rights under the Subcontract's dispute resolution provision. *See* [DE 100].[10] The only issue for the Court, therefore, is whether MWB's third-party claims against Korellis fall within the scope of the dispute resolution incorporation clause in the Subcontract (Section 14.1) and the arbitration agreement in the Prime Contract (Section 13.2 of the Standard Agreement and Section 15.3 of the General Conditions[11]).

A.   FEDERAL AND STATE LAW APPLICABLE TO ARBITRATION AGREEMENTS

In a recent decision discussing the FAA, the Seventh Circuit summarized federal jurisprudence on the issue of arbitration, explaining that the Supreme Court "has established four principles that guide [a court's] analysis" on a motion to compel arbitration. *United Nat. Foods, Inc. v. Teamsters Local 414*, 58 F.4th 927, 933 (7th Cir. 2023). "First and foremost, it is the parties'

---

[9] *See also MGP Elecs., Inc. v. Elec. Design & Sales, Inc.*, No. 1:19-cv-483-HAB-SLC, 2020 WL 13574308, at *2 (N.D. Ind. Jan. 24, 2020) (to obtain a stay pending arbitration, "the party applying for the stay [must not be] in default in proceeding with such arbitration'" (quoting *C. Itoh & Co. (Am.) Inc. v. Jordan Int'l Co.*, 552 F.2d 1228, 1231 (7th Cir. 1977))), *objections overruled*, No. 1:19-cv-483-HAB, 2020 WL 995824 (N.D. Ind. Mar. 2, 2020).

[10] *Cf. AGCO Corp. v. Anglin*, 216 F.3d 589, 593 (7th Cir. 2000) (holding that defendants did not waive objection to arbitration where they "carefully and explicitly, in unambiguous language, made known … [their] clear intention to preserve their objection to the arbitrability of the Retail Obligations, even though they agreed to proceed with the arbitration hearing" (internal quotation marks and citation omitted)).

[11] For simplicity, all references to any provision of either Article 13 or Article 15 going forward will omit the information that Article 13 is found in the Standard Agreement portion of the Prime Contract, while Article 15 is found in the separate but incorporated General Conditions contract document.

contract that determines the duty to arbitrate." *Id.* Thus, although the case law frequently refers to "the FAA's 'policy favoring arbitration,'" that policy "does not authorize federal courts to invent special, arbitration-preferring procedural rules." *Morgan v. Sundance, Inc.,* 142 S. Ct. 1708, 1713 (2022); *see Johnson v. Mitek Sys., Inc.*, 55 F.4th 1122, 1124 (7th Cir. 2022) ("Courts cannot disfavor arbitration, compared with other agreements, but neither may courts jigger the rules to promote arbitration." (citing *Morgan*)). The policy favoring arbitration "'is merely an acknowledgment of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts.'" *Morgan*, 142 S. Ct. at 1713 (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 302 (2010) (internal quotation marks omitted)). "Or in another formulation: The policy is to make 'arbitration agreements as enforceable as other contracts, but not more so.'" *Id.* (quoting *Prima Paint Corp.,* 388 U.S. at 404, n.12)); *see also First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (arbitration "is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration"); *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 808–09 (7th Cir. 2011) (the "strong federal policy in favor of arbitration," does not permit a court to construe the FAA's provisions "so broadly as to include claims that were never intended for arbitration" (internal quotation marks and citations omitted)).

"Second, whether the parties have agreed to arbitrate a particular issue is presumptively a question for judicial determination. 'Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.'" *United Nat. Foods, Inc.*, 58 F.4th at 933-34 (internal citation omitted) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649 (1986) (collecting cases)).

"Third, a court must determine whether a claim is subject to arbitration without consideration of the underlying merits of the case. [The Court's] focus is limited to what subjects the parties have agreed to arbitrate and whether the matter at issue is among them. [The Court] must resist any temptation to assess the strength or weakness of the claim for any reason, even if it is only to satisfy [itself] that the claim is not frivolous." *Id.* at 934 (citations omitted).

Finally, "where the contract includes an arbitration clause, but the language of that clause is ambiguous as to whether it applies to the particular matter at hand, there is a rebuttable presumption of arbitrability in the sense that [a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Id.* (internal quotation marks and citations omitted). "'Such a presumption is particularly applicable where the clause is as broad as' one providing for the arbitration of any dispute related to the interpretation of the agreement or the parties' performance thereunder." *Id.* (quoting *AT&T Techs.,* 475 U.S. at 650).

While these federal law principles apply generally to Korellis's motion to compel arbitration, the Court applies state law to determine whether MWB's third-party claims fall within the scope of the parties' agreement to arbitrate. *See Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 710-11 (7th Cir. 2019) (state law applies to determining formation and scope issues regarding an agreement to arbitrate); *see also In re Remicade (Direct Purchaser) Antitrust Litig.,* 938 F.3d 515, 519-23 (3d Cir. 2019) (discussing threshold matter of whether federal or state law governs the scope of an agreement to arbitrate). Because subject matter jurisdiction over this case is premised on diversity of citizenship, Indiana choice of law principles determine the applicable state law. *See E. Coast Ent. of Durham, LLC v. Houston Cas. Co.,* 31 F.4th 547, 550 (7th Cir.

8

2022) ("[a] federal court sitting in diversity applies the choice-of-law rules of the forum state"). "Indiana law clearly favors contractual choice-of-law … provisions and presume[s] that contracts represent the freely bargained agreement of the parties." *St. Paul Travelers Cos., Inc. v. Corn Island Shipyard, Inc.,* 437 F. Supp. 2d 837, 842 (S.D. Ind. 2006) (internal quotation marks and citation omitted), *aff'd,* 495 F.3d 376 (7th Cir. 2007). The Subcontract and the Prime Contract both select the law of the state where the Project is located, which is Indiana, as the applicable law governing interpretation of those contracts and disputes between the parties to those contracts. *See* [DE 11-2 at 7, 12 (§ 14.2 and Addendum ¶ 8); DE 1-1 at 56 (§ 13.1)[12]]. In addition, Indiana law "makes void any provision in 'a contract for the improvement of real estate in Indiana' that 'makes the contract subject to the laws of another state.'" *MPACT II,* 802 N.E.2d at 906 n.3 (quoting Ind. Code § 32–28–3–17). Therefore, pursuant to the applicable contract provisions and Ind. Code § 32–28–3–17, the Court applies Indiana law.

Indiana courts, like federal courts, "recognize a strong public policy favoring enforcement of arbitration agreements." *Tender Loving Care Mgmt., Inc. v. Sherls*, 14 N.E.3d 67, 71 (Ind. Ct. App. 2014); *see also Nightingale Home Healthcare, Inc. v. Helmuth*, 15 N.E.3d 1080, 1085 (Ind.

---

[12] Section 13.1 of the Prime Contract states that it "shall be governed by the law of the place where the Project is located *except that,* if the parties have selected arbitration as the method of binding dispute resolution, the Federal Arbitration Act shall govern Section 15.4." [DE 1-1 at 56 (emphasis added)]. The Supreme Court has said that "the best way to harmonize" a contractual provision stating that the contract would be governed by the laws of New York with an arbitration provision in the same contract stating that any controversy arising out of the contract shall be settled by arbitration in accordance with the rules of the National Association of Securities Dealers, was "to read [the choice-of-law provision selecting New York law] to encompass substantive principles that [New York] courts would apply, but not to include special rules limiting the authority of arbitrators." *Mastrobuono v. Shearson Lehman Hutton, Inc*., 514 U.S. 52, 58, 63-64 (1995). This case does not involve a situation where Indiana law conflicts with the FAA on an issue concerning the authority of the arbitrators. The only issues before the Court relate to the meaning and scope of the contractual dispute resolution procedures, for which, as discussed above, federal and Indiana law are essentially the same.

Ct. App. 2014) ("when construing arbitration agreements, every doubt is to be resolved in favor of arbitration"). The Indiana Supreme Court recently made clear, however, that "imposing on parties a policy favoring arbitration before determining whether they agreed to arbitrate could frustrate the parties' intent and their freedom to contract." *MPACT II,* 802 N.E.2d at 906. In making this pronouncement, the Indiana Supreme Court distinguished between "the treatment given questions of the existence of an agreement to arbitrate and questions of the scope of an agreed-to arbitration clause." *Id.* The policy favoring arbitration applies to the latter, not to the former. That is, "[o]nly after it has been determined that the parties agreed to arbitrate their disputes does the policy favoring arbitration play an important role." *Id.* at 907. Accordingly, as the Court interprets both federal and state law, if the agreement to arbitrate unambiguously does *not* cover the dispute at hand, then the federal and Indiana policies in favor of arbitration never come into play. But if the agreement to arbitrate is ambiguous as to the scope of the agreement to arbitrate, then the Court construes the agreement liberally in favor of arbitration.

### B.   SECTION 14.1 OF THE SUBCONTRACT

The Court begins with the parties' arguments regarding Section 14.1 of the Subcontract. In interpreting a contract, Indiana law requires ascertainment of "the intent of the parties at the time the contract was made, as disclosed by the language used to express the parties' rights and duties." *Ryan v. TCI Architects/Eng'rs/Contractors, Inc*., 72 N.E.3d 908, 914 (Ind. 2017). The court "look[s] at the contract as a whole" and "accept[s] an interpretation of the contract that harmonizes all its provisions." *Id.* "A contract should be construed so as to not render any words, phrases, or terms ineffective or meaningless." *Id.* "If a contract is ambiguous solely because of the language used in the contract and not because of extrinsic facts, then its construction is purely a question of law to be determined by the trial court." *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1133 (Ind.

1995). A contract "is ambiguous if it is susceptible to two or more reasonable interpretations such that reasonable people would differ as to its meaning, but the mere fact that the parties to the litigation differ as to that meaning is not enough to establish ambiguity." *Justice v. Am. Fam. Mut. Ins. Co*., 4 N.E.3d 1171, 1176 (Ind. 2014) (citations omitted); *see also Beam v. Wausau Ins. Co*., 765 N.E.2d 524, 528 (Ind. 2002) ("an ambiguity is not affirmatively established simply because controversy exists and one party asserts an interpretation contrary to that asserted by the opposing party" (internal quotation marks and citation omitted)).

Korellis's argument in favor of compelling arbitration essentially begins and ends with the first part of the first sentence of Section 14.1, which as previously noted incorporates by reference "the dispute resolution provisions of the Prime Contract between MW[B] and Owner … so as to be binding as to disputes between Subcontractor and MW[B] that involve, in whole or in part, questions of fact and/or law that are common to any dispute between MW[B] and Owner or others similarly bound to such dispute resolution procedures …." [DE 11-2 at 7]. According to Korellis, Section 13.2 of the Prime Contract provides for arbitration as the applicable method of dispute resolution under that agreement, and, since MWB's third-party claims involve "questions of fact and/or law that are common to" Eastgate's claims against MWB, Section 14.1 requires arbitration of those claims.

For its part, MWB does not dispute Korellis's assertion that Section 14.1 of the Subcontract validly incorporates the Prime Contract's arbitration requirements. *See MPACT II,* 802 N.E.2d at 907 ("It is well settled that, under the Federal Arbitration Act, an agreement to arbitrate may be validly incorporated into a subcontract by reference to an arbitration provision in a general contract." (internal quotation marks and citation omitted)). MWB disagrees, however, with Korellis's arguments regarding the scope of the Subcontract's incorporation clause. As MWB

points out, Section 14.1 does not end with the language on which Korellis relies. Instead, Section 14.1 states in full as follows:

> 14.1 Subcontractor agrees that the dispute resolution provisions of the Prime Contract between MW[B] and Owner, if any, are incorporated by reference as part of this Subcontract so as to be binding as to disputes between Subcontractor and MW[B] that involve, in whole or in part, questions of fact and/or law that are common to any disputes between MW[B] and Owner or others similarly bound to such dispute resolution procedures, and that all such disputes may be consolidated for hearing and resolution by the same arbitration or other tribunal specified in the contract between MW[B] and Owner. In addition, MW[B] and Subcontractor agree that in the absence of any requirement to mediate, the parties agree that mediation is a condition precedent to any other dispute resolution set forth in paragraph 14.2 below.

[DE 11-2 at 7].

MWB further points out that Section 14.2 of the Subcontract provides for an additional dispute resolution procedure as follows:

> 14.2 Upon exhaustion of the dispute resolution above [Section 14.1] or if the conditions in paragraph 14.1 are not applicable, MW[B], at its sole option, has the right to elect resolution of all claims or disputes involving MW[B], Subcontractor or other interested third parties by litigation in court, mediation and/or arbitration. If MW[B] elects to resolve disputes through litigation, no action or proceeding shall be commenced or maintained except in the District Court of Johnson County, Kansas, or in the United States District Court of Kansas, at Kansas City. If selected, mediation and arbitration will be conducted pursuant to the Construction Industry Rules of the American Arbitration Association; the parties may use the American Arbitration Association to administer the dispute resolution process but are not required to do so. Unless otherwise required by the Prime Contract, this Subcontract and all disputes between the parties shall be governed by the laws of the State [where the Project is located]. …

[*Id.* at 7, 12].

MWB argues that, while Section 14.1 of the Subcontract incorporates the dispute resolution procedures in the Prime Contract, it does not grant Korellis an independent right to demand

arbitration. Instead, MWB argues, Section 14.1 is merely a "joinder clause" that operates in the event that either MWB or Korellis have claims under the Subcontract related to a dispute between Eastgate and MWB that is proceeding in arbitration. According to MWB's reading of the Subcontract, MWB and Korellis agreed to two separate pathways for dispute resolution, the first being Section 14.1—as a means of joining Korellis to the same dispute resolution process that involve both Eastgate and MWB, whether arbitration or litigation—and the second being Section 14.2, for classes of disputes not involving Eastgate, for which Korellis agreed would be resolved through either litigation or arbitration, at MWB's sole option and election.[13] Under this interpretation of the Subcontract, Section 14.1 does not give Korellis the right "to extract itself from this lawsuit and independently demand arbitration with MW[B]." [DE 96 at 14].

The Court agrees with MWB that the parties did not intend for Section 14.1 of the Subcontract to be a stand-alone agreement to arbitrate disputes between Korellis and MWB. "Where a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties. However, if in a written contract, a reference is made to another writing for a particularly designated purpose, the other writing becomes a part of the contract only for the purpose specified, and is foreign to the contract for all purposes other than the one specified." *MPACT I,* 785 N.E.2d at 639 (citing *I.C.C. Protective Coatings, Inc. v. A.E. Staley Mfg. Co.*, 695 N.E.2d 1030, 1036 (Ind. Ct. App. 1998) (citing 17A AM. JUR. 2d, *Contracts*, § 400 at 426 (1991))). Here, the contract

---

[13] MWB notes that Section 14.2 contemplates that venue for litigation may be in certain state or federal courts of Kansas, despite the fact that the Project is located in Indiana and Indiana law applies to the Subcontract. However, that venue provision is not relevant here, either because Section 14.1 applies to require Korellis to be joined in this lawsuit with Eastgate, or because Korellis has waived any objection based on improper venue. *See Auto. Mechs. Loc. 701,* 502 F.3d at 746 ("an objection to venue 'can be waived or forfeited'" (citation omitted)).

13

language demonstrates an intent to incorporate the dispute resolution provisions of the Prime Contract not for all purposes but instead for the specific purpose of requiring that any dispute between MWB and Korellis be joined in the same forum in which disputes between Eastgate and MWB are being litigated where those disputes involve common questions of fact or law. Although not explicit, this contractual intent is made clear in a number of ways.

To begin with, "it is well settled that a contracting party may unilaterally waive a provision of the contract ... which has been placed in the contract for that party's benefit." *Open Text Corp. v. Grimes*, 262 F. Supp. 3d 278, 286 (D. Md. 2017) (quoting 13 WILLISTON ON CONTRACTS § 39:24 (4th ed.)). MWB's "ability to waive the [any arbitration requirement imposed by Section 14.1] derives from the language of the [Subcontract] itself," *id.*, which starts with the language "Subcontractor *agrees* … ." "That is, while [courts] ha[ve] interpreted agreements which expressly bind each party to a specified forum, the specific language of [Section 14.1 of the Subcontract] only includes a promise by" *Korellis*. *Id.* A contractual intent to bind only Korellis and not MWB is further shown by the language that follows: "so as to be *binding* as to disputes between [Korellis] and MW[B] that involve, in whole or in part, questions of fact and/or law that are common to any disputes between MW[B] and [Eastgate] or others similarly bound to such dispute resolution procedures." This language suggests an intent to require ("bind") Korellis to join in those proceedings that involve common questions of law or fact. That Section 14.1 was intended to impose a duty on Korellis, not an independent or mutual right to invoke arbitration for dispute resolution purposes generally, is further buttressed by Section 14.2, which grants MWB the unilateral right to determine whether disputes outside of Section 14.1 are resolved through litigation or arbitration. Nowhere in either Section 14.1 or Section 14.2 is there any language that

14

would suggest that Korellis has the independent right to demand arbitration over MWB's objections.

Korellis argues to the contrary based primarily on the "common questions of fact and/or law" language in Section 14.1. As Korellis points out, MWB's third-party claims against it indisputably satisfy this requirement. But the "common questions of fact and/or law" language in Section 14.1 actually points to the opposite of what Korellis is arguing. The only logical interpretation of that language is that Section 14.1 was intended to be a joinder provision, not a stand-alone arbitration clause, for what other purpose would there be for a requirement of "common questions of fact and/or law" than to ensure that such questions are resolved *in the same proceeding*? Korellis admits that for Section 14.1 to apply for purposes of invoking the Prime Contract's dispute resolution procedures, there must be "common questions of fact and/or law," but then contends that those procedures could be invoked to allow Korellis to litigate the "common questions of fact and/or law" separately from the parties to the Prime Contract. Such an interpretation of Section 14.1 would frustrate the very purpose of "the common questions of fact and/or law" requirement for invoking the Prime Contract's dispute resolution procedures in the first place. If the intent of Section 14.1 were to grant Korellis an independent right to arbitrate regardless of the fact that common questions of law or fact were being simultaneously litigated between Eastgate and MWB in another forum, then there would be no need for Section 14.1 to contain the language requiring common questions of law or fact. Instead, the Subcontract could have simply incorporated the dispute resolution procedures in the Prime Contract for all disputes between Korellis and MWB. Not only is the incorporation language of Section 14.1 more limited, it is immediately followed by language emphasizing the *joinder* purpose of the provision: "and that all such disputes [involving common questions of law or fact] *may be consolidated for hearing*

*and resolution by the same arbitration or other tribunal* specified in the contract between MW[B] and Owner." This language is superfluous if the parties actually intended to bind MWB to arbitration of disputes with Korellis even when the common questions of law or fact at issue are being litigated in court by MWB and Eastgate.

Although not conclusive, other provisions in the Subcontract are also telling. For instance, Section 1.1 states that Korellis "acknowledges that it has been given the opportunity … to review all of the documents comprising the Prime Contract, and agrees to be bound by the terms of the Prime Contract to the same extent that MW[B] is bound for the work contemplated by this Subcontract." [DE 11-2 at 2]. The purpose of this provision seems to be one of avoiding inconsistencies between obligations imposed on MWB by the Prime Contract and the Subcontract, and protecting Eastgate by ensuring that Korellis, as a subcontractor with a contractual relationship only with MWB, nevertheless was bound by MWB's obligations to Eastgate under the Prime Contract.[14] Attempting to break off a piece of this litigation to have it resolved in a separate forum is contrary to that general contractual intent.[15] While Korellis might argue the fault lies with the

---

[14] The Indiana Supreme Court in *MPACT II* recognized that this was the general intent behind similar subcontract language, as well as language in the General Conditions regarding subcontracts. *See* 802 N.E.2d at 907 (quoting subcontract: "the Sub-contractor acknowledges that he has read the General contract … and agrees to comply with and perform all provisions thereof applicable to the Sub-Contractor. … The contract documents are complementary and what is required by any one shall be binding as if required by all."); *id.* at 908 (quoting Article 5.3.1 of the General Conditions of the prime contract, which was incorporated into subcontract and stated: "By appropriate agreement … the contractor shall require each Subcontractor … to assume toward the Contractor all of the obligations and responsibilities which the Contractor, by these Documents, assumes toward the Owner and Architect."). As the court explained, "[a] comment from the American Institute of Architects, drafters of the General Conditions, … states [that] '[a] basic requirement of the contract [Article 5.3.1 of the General Conditions] is that subcontractors be bound by the terms of the contract documents," and, in fact, the AIA subcontract form (A401 Standard Form Agreement Between Contractor and Subcontractor), contains language effectuating that purpose. *Id.* at 908.

[15] In *MPACT II*, the court held that the incorporation language in the subcontract did not include the arbitration clause in the prime contract, notwithstanding that the court acknowledged that the

16

parties to the Prime Contract for failing to comply with the arbitration requirement in the Prime Contract as to their dispute, the Prime Contract makes clear that arbitration is not the sole method for resolving disputes under that agreement. Thus, Section 13.2 selects arbitration pursuant to Section 15.4 as the applicable dispute resolution procedure *only* "[f]or any Claim subject to, but not resolved by mediation[.]" [DE 1-1 at 11]. And Section 13.4.1 of the General Conditions states that "[d]uties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law." [*Id.* at 56]. Read together, these provisions anticipate that certain disputes under the Prime Contract may be subject to suit in court.

The Subcontract too specifically contemplates that Korellis may be subject to litigation, and not arbitration, in disputes between Eastgate and MWB involving common questions of law and fact. For example, Section 7.1 of the Subcontract provides that Korellis

> …. shall defend all *suits* brought against MW[B], its surety and/or [Eastgate] to the extent any such claims of liability allege damages caused by, or arising out of the performance of the Work, by [Korellis] or persons or entities for which [Korellis] is responsible, shall pay any *judgments* rendered against MW[B] to the extent [Korellis] is found liable for such claims, and shall reimburse and indemnify MW[B] for all expenses, including *court costs* and

---

general contractor likely intended to incorporate the arbitration clause. The problem the court found in that case was that the subcontract form used by the general contractor failed to implement the contractual intent of incorporation envisioned by Article 5.3.1 of the General Conditions of binding the subcontractor to the terms and conditions of the prime contract. *See MPACT II,* 802 N.E.2d at 909. Thus, the court held that, although the general contractor "may well have believed the language it used was sufficient to bind the Subcontractors to arbitration," the language was insufficiently clear and explicit to achieve that goal. *Id.* The MWB/Korellis Subcontract does not suffer from the same defect in *MPACT II*, as the language in Section 1.1 of the Subcontract whereby Korellis agreed to be bound by the terms of the Prime Contract is broader than the provision at issue in *MPACT II*, and, in addition, the Subcontract here contains the separate dispute resolution provisions in Sections 14.1 and 14.2, which were absent in the subcontract at issue in *MPACT II*.

> attorneys' fees, incurred by MW[B] to the extent [Korellis] is found
> liable for such claims.…

[DE 11-2 at 12 (Addendum ¶ 4) (emphasis added)]. Similarly, Section 7.2 of the Subcontract states that Korellis

> expressly assumes with respect to the work to be performed
> hereunder all liability imposed on MW[B] and its surety by the
> provisions of the Prime Contract and, upon request by MW[B],
> [Korellis] shall defend all *suits* brought against MW[B], its surety
> and/or [Eastgate] on account of any such liability or claims of
> liability and shall pay any settlements made or *judgments* rendered
> with respect thereto, and shall reimburse and indemnify MW[B] for
> all expenses, including *court costs* and attorneys' fees, incurred by
> MW[B] by reason of any such claim of liability.

[*Id.* at 5 (emphasis added)]. The references in Sections 7.1 and 7.2 to "suits," judgments" and "court costs" highlight that Korellis was subject to litigation in addition to arbitration, and, more importantly, that disputes between MWB and Eastgate involving Korellis's work were among those that could require litigation, notwithstanding the incorporation language in Section 14.1 and the arbitration provision in the Prime Contract.[16]

In short, while the first portion of the incorporation language in Section 14.1 of the Subcontract arguably supports Korellis's argument in favor of arbitration, that language must be read in the larger context of the entire provision, as well as the entire Subcontract and Prime Contract.[17] The Court is satisfied that, although not explicitly articulated, the parties intended the

---

[16] Korellis argues that these indemnification provisions only refer to third-party claims arising out of the Subcontract not involving a claim brought by Eastgate against MWB. *See* [DE 95 at 10]. But nothing in Sections 7.1 and 7.2 limits those provisions to third-party claims against MWB and Eastgate. In fact the contractual language refers to suits "against MW[B], its surety and/*or* [Eastgate]," which plainly would encompass a suit brought against MWB only; for instance, one brought *by* Eastgate against MWB.

[17] *See, e.g., MPACT II*, 802 N.E.2d at 908 (citing *Allied Structural Steel Co. v. State*, 148 Ind. App. 283, 288, 265 N.E.2d 49, 52 (1970) ("The true meaning of a contract is to be ascertained from a consideration of all its provisions, and a liberal or technical construction of an isolated clause should not be indulged to defeat the true meaning."), and *Gen. Ins. Co. of Am. v. Hutchison*, 143

incorporation language of Section 14.1 of the Subcontract to mean no more than that Korellis was required to join in any dispute resolution proceedings in which Eastgate and MWB were litigating common questions of law or fact. Most compelling in this regard is the second part of the first sentence in Section 14.1, which follows the portion cited by Korellis and states "that all such disputes may be consolidated for hearing and resolution by the same arbitration or other tribunal specified in the contract between MW[B] and [Eastgate]. [DE 11-2 at 7]. When viewed in its entirety, including in the context of what follows the portion quoted by Korellis, the Court concludes that Section 14.1 is susceptible to only one reasonable interpretation: that Korellis agreed to be subject to either litigation or arbitration, not at its own election but that of MWB, and that, in any event it consented to be joined in the applicable dispute resolution proceeding between Eastgate and MWB. Since the current dispute is in litigation, the Subcontract requires Korellis to be joined in this same lawsuit, and there is no basis for Korellis to extract itself and independently demand arbitration with MWB.

### C.     The Scope of the Arbitration Provision in the Prime Contract

MWB also disagrees with Korellis's arguments regarding the scope of the arbitration provision in the Prime Contract. According to MWB, the arbitration proceeding in the Prime Contract relates only to "disputes arising during the Project and not post-construction disputes." [DE 96 at 15]. Under this interpretation of the Prime Contract, even if Section 14.1 of the Subcontract was not intended to be solely a joinder clause, Korellis still would not have a right to arbitration because arbitration would not be available under the Prime Contract on the facts of this case, which involves post-construction disputes.

---

Ind. App. 250, 254, 239 N.E.2d 596, 598–99 (1968) ("It is the general rule of law in our State that words, phrases, sentences, paragraphs and sections of a contract cannot be read alone." (italics omitted)).

Once again, the Court agrees with MWB. The two relevant provisions of the Prime Contract that address the scope of the arbitration requirement in that agreement are Section 13.2 and Section 15.4. As previously noted, Section 13.2 identifies "Arbitration pursuant to Section 15.4" as the selected method for binding dispute resolution. [DE 1-1 at 11]. But Section 13.2 states that arbitration applies to "any Claim *subject to, but not resolved by mediation* pursuant to Section 15.3 of [the General Conditions]." [*Id.* (emphasis added)]. Using similar language, Section 15.4.1 states that, "[i]f the parties have selected arbitration as the method for binding dispute resolution in the Agreement, any Claim *subject to, but not resolved by mediation* shall be subject to arbitration …." [*Id.* at 61 (emphasis added)]. The plain language of these provisions is that the scope of the arbitration requirement turns on the meaning of the word "Claim."

According to the Prime Contract,

> [a] Claim is a demand or assertion by one of the parties seeking, as a matter of right, payment of money, or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor *arising out of or relating to the Contract*. The responsibility to substantiate Claims shall rest with the party making the Claim.

[*Id.* at 59 (§ 15.1.1) (emphasis added)]. Korellis argues that Sections 13.2, 15.1.1, and 15.4.1 combined mean that the Prime Contract requires arbitration of all disputes "arising out of or relating to the Contract." But in the Court's view, an isolated reading of those three provisions does not fairly reflect the contracting parties' true intentions.[18] Rather, an examination of the Prime

---

[18] *See Simon Prop. Grp., L.P. v. Mich. Sporting Goods Distribs., Inc*., 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005) (to determine the meaning of a contract, the court must examine "all of its provisions, without giving special emphasis to any word, phrase, or paragraph"); *Hyperbaric Oxygen Therapy Sys., Inc. v. St. Joseph Med. Ctr. of Ft. Wayne, Ind*., 683 N.E.2d 243, 249 (Ind. Ct. App. 1997) ("'Particular words and phrases cannot be read alone; we must gather the parties' intentions from the contract considered as a whole.'" (quoting *Buck v. Banks*, 668 N.E.2d 1259, 1261 (Ind. Ct. App. 1996)));  *Link v. Breen*, 649 N.E.2d 126, 128-29 (Ind. Ct. App. 1995) ("to

Contract as a whole shows the following: (1) the arbitration requirement applies to "Claims," (2) the capitalized word "Claim" has a defined meaning, and (3) even though the Contract does not expressly so state, the intent of the contracting parties was to include in that definition only disputes that arose *during* the construction of the Project.

These conclusions follow from the contract terms found in Article 15 of the Prime Contract under the heading "Claims and Disputes." The provisions of Article 15 describe a four step process for resolving "Claims and Disputes," initiated by a written notice requirement, followed by a decision by a person or entity described as the "Initial Decision Maker," followed by mediation, followed by binding arbitration. Beginning with the first step, Section 15.1.1 sets out the previously quoted definition of the word "Claim," and then Section 15.1.2 requires that "Claims by either the Owner or Contractor must be initiated by written notice to the other party *and to the Initial Decision Maker ...within 21 days* after occurrence of the event giving rise to such Claim or *within 21 days* after claimant first recognizes the condition giving rise to the Claim, whichever is later." [*Id.* (emphasis added)]. Section 15.1.3 states that, "[p]ending final resolution of a Claim, … the Contractor shall *proceed diligently with performance* of the Contract and the Owner shall *continue to make payments* in accordance with the Contract Documents." [*Id.* (emphasis added)]. Sections 15.1.4 and 15.1.5 then address two specific sub-categories of "Claims." Section 15.1.4 applies to "Claims For Additional Cost," and states that, for such claims, the Contractor must provide "written notice … *before proceeding to execute* the Work." [*Id.* (emphasis added)]. Section 15.1.5 applies to "Claims For Additional Time," and provides that the Contractor must "include an estimate … of [the] probable *effect of delay on progress of the Work.*" [*Id.* (emphasis

---

ascertain the parties' intent, words and phrases must be read in light of other language of the contract").

added)]. These provisions on their face have no relevancy to post-construction disputes. Instead, the requirements of written notice within a short time frame, of continued performance of the work and continued payments, of notice before "proceeding to execute" work, and of estimates regarding anticipated delays, all "relate[ ] to the process of construction, and not occurrences or conditions that are discovered after the process of construction is complete." *Blackman & Co. v. GE Bus. Fin. Servs., Inc.*, Civil No. 15-7274 (NLH/JS), 2016 WL 3638110, at *6 (D.N.J. July 7 2016).

In addition, the requirement of notice of a Claim to the "Initial Decision Maker" is telling. "The Initial Decision Maker is the person identified in the Agreement to render initial decisions on Claims in accordance with Section 15.2 and certify termination of the Agreement under Section 14.2.2." [DE 1-1 at 35 (§ 1.1.8)]. The Prime Contract appoints the "Construction Administrating Architect" or "CAA" to "serve as Initial Decision Maker pursuant to Section 15.2 [of the General Conditions][.]" *See id.* at 1 (identifying BLDR Associates, Inc. as the CAA); *id.* at 11 (§ 13.1); *id.* at 60 (§ 15.2.1)]. Giving notice to the Initial Decision Maker within the short time frames stated is not only unrealistic regarding post-construction disputes, it would serve no purpose as the Initial Decision Maker's role and purpose is terminated upon completion of the Project. *See* [*id.* at 50 (§ 9.10.1) ("[W]hen the CAA finds the Work acceptable under the Contract Document and the Contract fully performed, the CAA will promptly issue a final Certificate for Payment[.]"); *id.* at 41 (§ 4.2.1) (the CAA "will provide administration of the Contract … during construction until the date … the final Certificate For Payment" is issued).

Indeed, with respect to the particular type of contract before the Court:

> [I]t is well understood, as a general matter, that in the typical construction contract and certainly in AIA Document A201, the architect or other designated design professional such as an engineer, has multiple roles. [T]he design professional functions as

> agent of the owner, as a consultant, and also as an arbiter. Thus,
> Article 4 of AIA Document A201 designates the architect ... as the
> administrator of the contract and as the arbiter of contract disputes.

*Blackman & Co.,* 2016 WL 3638110, at *6 (internal quotation marks and citation omitted). Article

4 of the Prime Contract provides that the CAA shall be "lawfully licensed to practice architecture

… in the jurisdiction where the Project is located." [DE 1-1 at 41 (§ 4.1.1)]. The CAA "conduct[s]

inspections" and "issue[s] Certificates of Substantial Completion" and "a final Certificate for

Payment" (§ 4.2.9); the CAA also "interpret[s] and decide[s] matters concerning performance

under, and requirements of, the Contract Documents" (§ 4.2.11); and, when interpreting and

making decisions regarding the Contract Documents, the CAA must "endeavor to secure faithful

performance by both Owner and Contractor" without "show[ing] partiality to either" (§ 4.2.12).

*See* [*id.* at 42]. The key role in the dispute resolution process played by the CAA serving as the

Initial Decision Maker demonstrates that the Prime Contract's "dispute resolution procedures,

including arbitration, concern claims related to ongoing construction and were intended to prevent

a construction issue from stymying the entire project." *Blackman & Co.,* 2016 WL 3638110, at *7.

It is especially telling that the first few steps in the "Claims and Disputes" process calling

upon the Initial Decision Maker to decide disputes are inapplicable to post-construction disputes,

because the steps in the four-step dispute resolution process build on one another. Thus, with the

exception of three categories of excluded Claims (hazardous materials, emergencies, and insurance

and bonds), the submission of Claims to the Initial Decision Maker *is mandatory. See* [DE 1-1 at

60 (§ 15.2.1) ("Claims … *shall* be referred to the Initial Decision Maker for initial decision."

(emphasis added)]. Furthermore, an initial decision by the CAA is for the most part a *required*

precondition to mediation. *See* [*id.* ("an initial decision *shall be required* as a condition precedent

to mediation of any Claim arising prior to the date final payment is due**,** unless 30 days have passed

after the Claim has been referred to the Initial Decision Maker with no decision having been

rendered" (emphasis added))]. The Initial Decision Maker is required to "review [the] Claim[ ] and *within ten days of the receipt* of a Claim take one or more of" enumerated actions. [*Id.* (§ 15.2.2)]. "If the Initial Decision Maker requests a party to provide a response to a Claim or to furnish additional supporting data, such party" is directed that it must ("shall") "respond, *within ten days* after receipt of such requests." [*Id.* (§ 15.2.4) (emphasis added)]. "Upon receipt of a response or supporting data, if any, the Initial Decision Maker" is directed to ("will") "either reject or approve the Claim in whole or in part." [*Id.*].

The court in *Blackman & Co.* held that an arbitration clause in a construction contract using the 1997 A201 General Conditions—employing similar contract language to the 2007 version at issue here including a broad definition of Claim as "[a]ny [dispute] arising out of or related to the Contract"—did *not* apply to post-construction disputes. As that court explained:

> That the architect serves as the arbiter of contract disputes between the owner and contractor dispels the notion that the arbitration provision applies to post-construction defects discovered years after final completion of the project. It also supports the conclusion that the arbitration provision only applies to claims that arise during construction. It would not make any sense for the architect to be designated as the first-line arbiter in the sequential dispute resolution procedures if those procedures applied to post-construction claims.
>
> The overridingly dispositive provision in the contract that supports this conclusion is that an initial decision by the architect is "required as a condition precedent to mediation, arbitration or litigation of all Claims between the Contractor and Owner arising prior to the date final payment is due, unless 30 days have passed after the Claim has been referred to the Architect with no decision having been rendered by the Architect." The term "arising prior to the date final payment is due" exemplifies that "claims" do not concern post-completion claims. Moreover, any decision by the architect would result, if applicable, in "a change in the Contract Sum or Contract Time or both." Those remedies would be moot after construction is completed and paid for.
>
> Additionally, the term "claim," which must be initiated within 21 days of an occurrence or the discovery of the condition, includes

24

> disputes and matters between the owner and contractor "arising out of or relating to the Contract," and the "contract" between Grove Street and Blackman is titled and defined as "Contract for Construction." The requirement of timely notice of a dispute to the architect concerning a "contract for construction" further supports that the entire contract, including the dispute resolution procedures, relates to the process of construction, and not occurrences or conditions that are discovered after the process of construction is complete. Indeed, the entire purpose of the architect serving as the arbiter is to ensure that the construction is completed in a proper and timely manner.

2016 WL 3638110, at *6 (internal record citations omitted and underscore in original).

Korellis points out that *Blackman & Co.* is an unpublished decision and is not controlling precedent. That may be, but the Court finds that its analysis of the very similar contract language in an earlier version of the same form AIA document comports with this Court's own reading of the AIA contract language at issue here. Korellis also tries to distinguish *Blackman & Co.* by arguing that the mediation and arbitration provisions in the contract before the New Jersey district court differ from the mediation and arbitration provisions in the Prime Contract in terms of the role played by the architect. According to Korellis, in *Blackman & Co.,* the mediation and arbitration provisions applied only "after initial decision by the Architect," whereas "the mediation and arbitration provisions of the Eastgate/MWB Prime Contract contain no reference to the Initial Decision Maker, nor do they include a requirement that the Initial Decision Maker first render a decision before the claim is submitted to mediation or arbitration." [DE 95 at 11-12]. In fact, however, as previously discussed, Section 15.2.1 does require that a Claim be submitted to the Initial Decision Maker before mediation. That a party *cannot* skip over the Initial Decision Maker stage and go straight to mediation is confirmed by Sections 15.2.6 and 15.2.6.1, which state that mediation is available only for "initial decisions." *See* [DE 1-1 at 60]. And there are timing rules applicable to a mediation demand which, if not met, results in a waiver of the "right[] to mediate or pursue binding dispute resolution proceedings with respect to the initial decision." [*Id.*

25

(§ 15.2.6.1); *see also id.* (§ 15.2.5 (stating that "[t]he initial decision [by the CAA] shall be final and binding on the parties but subject to mediation, and, if the parties fail to resolve their dispute through mediation, to binding dispute resolution")]. Furthermore, a party cannot skip mediation and go straight to arbitration, because mediation is "a condition precedent to binding dispute resolution." [*Id.* (§ 15.3.1)]. And arbitration is available only for "[c]laim[s] subject to, but not resolved by, mediation." [*Id.* at 61 (§ 15.4.1)]. As the *Blackman & Co.* court explained regarding similar contract provisions, "[t]he construction contract included specific provisions as to how issues—or claims—that arose during construction were to be resolved. The architect served as the initial decision-maker on claims that arose prior to 'final payment' to the contractor. If his decision was unsatisfactory to the parties, they were to attend mediation in good faith. If mediation was unsuccessful, the issue could then be submitted to arbitration. All of these procedures were on the clock: 21 days to submit the claim to the architect, 30 days to mediate, and then 30 days to arbitrate." 2016 WL 3638110, at *7.

Korellis also argues that MWB's interpretation of the arbitration requirement in the Prime Contract is contradicted by the language of Section 13.7, which states:

> **§ 13.7 Time Limits On Claims**
> The Owner and Contractor shall commence all claims and causes of action, whether in contract, tort, breach of warranty or otherwise, against the other arising out of or related to the Contract in accordance with the requirements of the final dispute resolution method selected in the Agreement within the time period specified by applicable law, but in any case not more than 10 years after the date of Substantial Completion of the Work.

[DE 1-1 at 57]. According to Korellis, "[t]he only 'final dispute resolution method selected in the Agreement' was arbitration, and when the Prime Contract was executed, Eastgate and MWB clearly contemplated they would assert contract-related claims against each other pursuant to the arbitration provision for up to 10 years following the completion of the project." [DE 95 at 12].

26

This time limit provision, however, does not capitalize the word "claim," whereas the capitalized word "Claim" is a defined term under Article 15. If the word "claim" in Section 13.7 included a "Claim" under Article 15, then there would be no need for a separate time limit provision applicable only to "Claims" in Article 15. Yet, Section 15.4.1.1 provides that a demand for arbitration must be made no later than "the date when the institution of legal or equitable proceedings based on the Claim would be barred by the applicable statute of limitations." [DE 1-1 at 61]. This separate deadline applicable to "Claims" under Article 15 parallels the deadline in Section 13.7, only without the ten year maximum limit. Although the reference in Section 13.7 to commencing a claim "in accordance with the requirements of the final dispute resolution method selected in the Agreement" is confusing, if as Korellis suggests this language constitutes an affirmation that the arbitration requirement applies to any and all claims, including post-construction disputes, the ten-year limit in Section 13.7 would conflict with the 21-day deadline in Section 15.1.3 for initiating a "Claim." Thus, Section 13.7 and Section 15.4.1.1 make sense and can best be harmonized by construing the "Claims" in Section 15.4.1.1 as referring to disputes that arose during construction, and hence are subject to the four-step dispute resolution procedure ending in arbitration, and construing the "claims" in Section 13.7 as referring to post-construction disputes that are not subject to that four-step process.[19] For the latter "claims," the parties' right to initiate litigation is preserved by Section 13.4.1, which states that:

> Duties and obligations imposed by the Contract Documents and
> rights and remedies available thereunder shall be in addition to and

---

[19] Another way of looking at it is: The word "claim" in Section 13.7 encompasses both post-construction claims and "Claims" under Article 15; but, to the extent "Claims" under Article 15 are included, the general time limit specified in Section 13.7 is further limited by the more specific limiting terms in Article 15, including the 21-day notice requirement applicable to such Claims and the requirement in Section 15.4.1.1, *for those Claims that complied with the 21-day notice requirement*, that arbitration be initiated within the time limit specified by applicable law.

> not a limitation of duties, obligations, right and remedies otherwise
> imposed or available by law.

[*Id.* at 56].

The fact that Section 15.4.1.1 provides for an extended time limit for initiating arbitration that parallels the time limit for bringing a claim outside of Article 15 does not suggest that arbitration applies to post-construction disputes. Instead, its purpose seems to be to ensure that a Claim arising during construction for which the four-step dispute resolution process had already been initiated prior to termination of the Prime Contract remains subject (within the applicable limitations period) to the final step in the four-step process, i.e., arbitration, even though performance under the Contract may have ended. Reading all of these provisions together the only reasonable inference to draw is that claims that first arise following final payment because they are not discovered until then (i.e., post-construction disputes) are outside the provisions of Article 15, "Claims and Dispute" where the arbitration requirement is found and are governed instead by Sections 13.4.1 and 13.7.

Although it does not involve a construction contract, the Court also finds the Seventh Circuit's recent decision in *United Natural Foods* instructive on the contract interpretation issue in this case. The collective bargaining agreement in *United Natural Foods*—similar to the Prime Contract here—laid out a four-step "Grievance and Arbitration Procedure." 58 F.4th at 930-31. The question for the court was whether the union was entitled to compel arbitration of the company's claim that the union violated a no-strike clause in the collective bargaining agreement. In ruling against the union, the court said that

> what is immediately apparent is that the process is employee-
> oriented from beginning to end. Section 14:01 provides that it is
> "[t]he aggrieved employee" who must contact his or her supervisor
> "with any occurrence, differences, disputes or complaints arising
> over the interpretation or application of the contents of this
> agreement." Thus, at the very outset, the agreement indicates that

the grievance and arbitration procedure is one meant to address employee concerns and disputes. That focus is reinforced in the outline of Step 1 of the grievance process, which involves a conference between the "aggrieved employee," the shift steward, and the shift supervisor. The next two steps on the grievance procedure proceed from that initial meeting. The fourth step is arbitration, which may be initiated by either party, as to a grievance that remains unresolved at the conclusion of Step Three in the resolution process.

*Id.* at 934.

Similarly, as discussed above, the four step dispute resolution process in Article 15 is oriented around the Initial Decision Maker. Like the arbitration provision in the collective bargaining agreement in *United Natural Foods*, the arbitration provision in the Prime Contract "is not a stand-alone arbitration clause allowing either party to arbitrate anything and everything that might arise under the [contract]. Rather, it constitutes the final step in a four-step procedure designed to resolve a particular set of grievances." *Id.* Section 15.4.1 makes "any Claim subject to, but not resolved by, mediation … subject to arbitration" [DE 1-1 at 61], confirming that arbitration is intended as a means of resolving disputes that arise during the construction process. "Nowhere does the contract signal that the reach of the arbitration provision is meant to be broader than" claims mediated by the contracting parties following an initial decision by the Initial Decision Maker, and the only claims subject to a decision by an Initial Decision Maker are claims that arose during the Project's construction. *United Nat. Foods,* 58 F.4th at 935. The focus on the Initial Decision Maker in the Prime Contract's dispute resolution procedure (like the focus on "the aggrieved employee" in the grievance procedure in *United Natural Foods*) "limits the universe of disputes arising from the agreement that are subject to the … arbitration procedure, and the four delineated steps in that procedure flow from this initial, limiting provision." *Id.* at 938.[20]

---

[20] The Seventh Circuit's decision in *United Natural Foods* also shows Korellis's reliance on the broad definition of "Claim" in § 15.1.1—which includes "disputes and matters in question between

"Under Indiana law, a contract is to be interpreted to mean what on its face it purports to mean, unless from the entire contract and the subject matter thereof, it is clear that some other meaning was intended. Further, the court must give effect to the meaning and intention of the parties as expressed in the language of the contract and where the terms of the contract are plain and free from uncertainty, it is not the proper function of the court to use any rules of interpretation or construction in determining the provisions of their agreement." *Williams v. Nat'l Can Corp.*, 603 F. Supp. 1268, 1275 (N.D. Ind. 1985) (citations omitted). Nevertheless, the fact that the Prime Contract does not expressly say that only disputes arising during construction fall under Article 15's dispute resolution process does not create an ambiguity that might trigger the presumption in favor of arbitration. As the Seventh Circuit explained in *United Natural Foods*,

> True, the agreement does not directly define the term "grievance," nor does it expressly state that the claims and complaints of the employer are excluded from this process (including arbitration). But in describing a process that from start to finish involves employee grievances alone, with no mention anywhere of employer-initiated disputes, the agreement unmistakably conveys the message that the dispute resolution procedure, including the provision for the arbitration of unresolved grievances, is one applicable solely to employee grievances.

---

the Owner and Contractor arising out of or relating to the Contract" [DE 1-1 at 59]—is misplaced. The union in *United Natural Foods* similarly relied on the collective bargaining agreement's definition of "grievance": "any occurrence, differences, disputes or complaints arising over the interpretation or application of the contents of this agreement." 58 F.4th at 937. But the court found no ambiguity from this broad definition, explaining that "the sentence containing that language begins with qualifying language indicating that it is '[t]he *aggrieved employee*' who must contact his/her supervisor in reference to such an occurrence, difference, dispute, or complaint." *Id.* (emphasis in original). The universe of disputes that can fall under the broad definition of "Claim" in § 15.1.1 is similarly limited by the requirement in Section 15.1.2 that Claims "*must be initiated by written notice* to the other party and *to the Initial Decision Maker … within 21 days* after occurrence of the event giving rise to such Claim or *within 21* days after the claimant first recognizes the condition giving rise to the claim, whichever is later." [DE 1-1 at 59 (emphasis added)].

58 F.4th at 935-36 (internal citations omitted). Here, Article 15's description of the four-step dispute resolution process "unmistakably conveys the message that" the process applies only to disputes arising during the construction process.

In sum, the Court "can say with confidence that the arbitration clause is not reasonably susceptible to an interpretation that includes [post-construction disputes]." *Id.* at 938. The four-step dispute resolution procedure in the Prime Contract "is focused exclusively on" disputes arising during construction "and does not envision or apply to" post-construction disputes. *Id.* Thus, MWB is not obligated to submit its dispute with Korellis to arbitration.[21]

## CONCLUSION

For the foregoing reasons, Korellis Roofing, Inc.'s Motion To Compel Arbitration and Stay Proceedings **[DE 94]**, is **DENIED**.

So ORDERED, this 29th day of March, 2023.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT

---

[21] This conclusion is further buttressed by the fact that neither Eastgate nor MWB has sought arbitration of their dispute under the Prime Contract's dispute resolution procedures. It is true that, "where a contract is clear and without ambiguity the intention is to be determined from the language of the contract and that the terms of the contract cannot be changed by evidence of extrinsic language or conduct of the parties." *Nice Ball Bearing Co. v. Bearing Jobbers, Inc.*, 205 F.2d 841, 845 (7th Cir. 1953); *see also Williams,* 603 F. Supp. at 1275 ("where a contract is not ambiguous, the court must only consider the language contained in the contract to determine the parties' intentions and may not consider the secret design in one party's mind or the conduct of the parties"). Nevertheless, the contracting parties' conduct "is an exposition of the contract by the parties themselves, and they best knew what their intention was, and what they believed their contract to mean." *Weinig v. Weinig*, 674 N.E.2d 991, 995 (Ind. Ct. App. 1996) (internal quotation marks and citation omitted).